WAKEFIELD *v.* STATE.

(*Knoxville*, September Term, 1939.)

Opinion filed October 21, 1939.

J. RALPH TEDDER, of Rockwood, and ELMER L. EBLEN, of Kingston, for plaintiff in error.

ERNEST F. SMITH, Assistant Attorney-General, for the State.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

This appeal is from a conviction of murder in the second degree, with a prison sentence of eleven years. Wakefield shot and killed Sampton Wolfe on a night in March, 1936, about 9 P. M., when the men met as Wolfe was proceeding toward his home and crossing over a corner of Wakefield's land. Errors are assigned insisting that the evidence preponderates in favor of self defense relied on by Wakefield; challenging the admission, as a dying declaration, of a lengthy typewritten statement, signed by Wolfe shortly before his death, which occurred in a hospital in Rockwood within three days of the shooting; insisting that the trial Judge erred in admitting over the objection of counsel for the defense the testimony given by the wife of the deceased as to a conversation she had with him when she found him wounded a short while after the affray, and raising other questions which we do not think it necessary to pass on at this time.

The State introduced no eyewitnesses and relied chiefly upon the alleged dying declaration of the deceased above mentioned, in which he purported to detail the circumstances of the shooting, insisting that he did not provoke the difficulty and made no assault upon Wakefield, but that he was met and stopped by Wakefield while proceeding toward his home and fired upon after the interchange of a few words, which he says related to the matter of the use of the pathway on which they met over or through a tract of land owned by Wakefield. It appears that in going to his home from Emory Gap,

something less than a mile distant, after leaving the main road running south there were two or three pathways over which the deceased might go to his house, but one of them running through Wakefield's land.

The record shows that bad feeling had existed between these men for a long time, and so far as we are able to discover the deceased was to blame, and very much to blame for this situation. Wakefield was employed by the Railroad to work on locomotives, and we find no evidence in the record of any misconduct on his part whatever prior to this shooting. There is some attempt to prove that he had made threats against Wolfe, but we are not impressed with some of this evidence, and in the next place, certainly Wolfe's conduct was calculated naturally to provoke resentment and threats from Wakefield. There seems to be little dispute on the record that the deceased, who appears to have been a whiskey vendor, had persisted in selling whiskey to the wife of Wakefield until she had become addicted to the habit and thereby greatly marred the home life and interfered with her capacity to care for eight or nine children. Also it seems undisputed that a few months previous Wolfe and a companion had taken the young daughter of Wakefield, something less than sixteen years of age, off and kept her all night and had intercourse with her, and so far as the record shows she had previously been chaste. They permitted her to return home about daybreak, after this night of debauchery, when her father met her and she told him of what had occurred. In her words, in response to the question "What did he say?" She answered, "He just broke down and cried."

Not content with this mistreatment, the record further shows that thereafter the deceased and his companion one night approached Wakefield, when he was alone at

work on his engine, and there abused and threatened his life if he took any steps to follow up or prosecute them for their misconduct. The young girl further testified that they had sent word by her to her father that if he did anything about it they would kill both father and daughter. Other instances of intimidation and abuse crop out in the record, one happening on this very evening of the shooting and shortly before.

Wakefield and his wife and another witness testify that as they were proceeding across Wakefield's land the deceased came upon them with abuse and violent threats and that thereupon Wakefield shot him. The State insists that neither the wife nor this other witness were present and contradictory statements were introduced as having been made by both of them. The record shows that there had been a previous trial when the jury was unable to agree on a verdict.

Enough has been said to show that this is a case not free from difficulty on the facts and that it is one in which the defendant is unquestionably entitled to the benefit of every reasonable doubt. We have found it unnecessary to discuss the facts further, or to pass upon the assignment challenging the preponderance of the evidence, for the reason that we think the trial Judge committed reversible error in permitting the wife of the deceased to testify to the conversation had with him, to which reference has above been made.

After testifying that her husband had gone up to Emory Gap to make some purchases, about 6 or 6:30 P. M., she said that around 9 o'clock she heard some shots down the road, was not certain how many, and then she heard someone hollow, but could not tell who it was; that later she went out on the porch and then identified the hollowing as coming from her husband; that she went

down the road to where he was and asked him what was the matter and he said he was shot. She was then asked by counsel and answered as follows: "Q. Did he say anything else there at that time? A. He said that Sim Wakefield had shot him and run away, had waylaid him." Counsel for Wakefield very vigorously protested the admission of this testimony. Mrs. Wolfe had previously stated in answer to the question how long after she had heard these shots until she got down where her husband was that "it was about five minutes, I guess." The trial Judge admitted the statement upon the theory that it was part of the *res gestae*. Counsel for Wakefield excepted and has made this the basis of an assignment in this Court, which assignment we think must be sustained.

The latest opinions of this Court discussing the application of the *res gestae* rule are in the cases of *Templeton* v. *State*, 146 Tenn., 272, 281, 240 S. W., 789, and *Garrison* v. *State*, 163 Tenn., 108, 40 S. W. (2d), 1009. In the first of these cases a statement made by the defendant very shortly after a shooting, and as the parties left the spot, that "he did not intend to shoot deceased" was held inadmissible as not a part of the *res gestae*. The opinion by Special Justice Smith has no discussion of the subject, but the holding is expressed in very positive terms. In the Garrison case testimony of a witness who approached the defendant immediately after the shooting to the effect that the defendant said that "he did not intend to kill the deceased but struck at him and the gun went off" was held to be admissible as a part of the *res gestae*, but that case is distinguishable from the instant case in several particulars. In the first place, it appears from the opinion that the decision of what was conceded to be a very close question, turned

upon an application of the rule announced in *Thomas* v. *State*, 121 Tenn., 83, 113 S. W., 1041, 1042, 130 Am. St. Rep., 756, that "if a party opens the door for the admission of incompetent evidence, he is in no plight to complain that his adversary followed through the door thus opened." This rule is laid down by Mr. Wigmore in his Work on Evidence, Vol. 1, Sec. 15. This rule was applicable in the Garrison case because it appeared that while the trial Judge rejected the statement hereinbefore mentioned favorable to the defendant, he had previously admitted another statement made a moment before testified to by a witness for the State which was not so favorable to the defendant. We have no such situation in the the instant case. Moreover, the statement in the Garrison case was one expressive of the mental attitude of the party rather than one of narrative or description of the act. The opinion in the Garrison case emphasizes this as a well taken distinction, citing authorities. That opinion also emphasizes the essential importance of the element of spontaneity as being the ultimate test of admissibility. A statement of one of the parties to an affray made subsequent in time is always rejected where it is a mere narrative of the past occurrence and when circumstances fail to preclude the idea of deliberation or fabrication.

In *Frank* v. *Wright,* 140 Tenn., 535, 546, 205 S. W., 434, in holding incompetent as not a part of the *res gestae* a statement, Mr. Justice WILLIAMS emphasized that the statement was not voluntary or spontaneous, but was called out by a question. This objection applies to the facts before us, as has been seen. When Mrs. Wolfe approached the deceased she inquired of him what was the matter and thus drew out from him the account which

she says he gave of the difficulty in which he had been shot.

That this statement given to the jury by the wife of the deceased, with the approval of the trial Judge, at an early stage of the trial, was prejudicial there can be no doubt. It may be added that the statement that Wakefield had waylaid him was hardly consistent with the dying declaration, to which reference has been made, since in that declaration he detailed at some length the discussion which the men had over the use by Wolfe of this way through the land of the defendant. Mrs. Wolfe estimated that this conversation was had with her husband about five minutes after the shooting took place. Length of time is not the ultimate test, but, as before stated, spontaneity, and whether the statement is narrative rather than an involuntary exclamatory expression of the feelings of the party. We are impressed that this statement was made to the wife with a more or less deliberate intent to build up a case against the defendant and we are of opinion that it was reversible error to admit it.

On this ground the judgment must be reversed and the case remanded for a new trial.